**STATE of Minnesota, Respondent,**

v.

**Joanne BEARD, Appellant.**

No. C9-97-488.

Court of Appeals of Minnesota.

Feb. 3, 1998.

Review Denied April 14, 1998.

John M. Stuart, State Public Defender, Marie L. Wolf, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Attorney General, St. Paul, for appellant.

Michael O. Freeman, Hennepin County Attorney, Gayle C. Hendley, Assistant County Attorney, Minneapolis, for respondent.

Considered and decided by KLAPHAKE, P.J., and HUSPENI and HARTEN, JJ.

## OPINION

HARTEN, Judge.

Appellant Joanne Beard was convicted of second-degree felony murder in the death of five-month-old Calvin Loftus, a child enrolled in the day care center she operated. *See* Minn.Stat. § 609.19(2) (1994). The trial court sentenced Beard to 360 months, a greater-than-double departure from the presumptive sentence of 165 months. We affirm as modified by reducing the sentence to 330 months.

## FACTS

The complaint charged Beard with a single count of second-degree felony murder (in the course of committing third-degree assault) for causing the death of 5–month–old Calvin Loftus by shaking him on December 13, 1995. Beard had been caring for Calvin in her residential day care for almost four months. The state presented evidence that Calvin was a healthy child with no previous medical problems except those it alleged resulted from Beard's mistreatment of him earlier while in her care. Calvin had fallen from a swing at his parents' home, however, about two weeks before his death. The defense argued that this fall caused a subdural hematoma, later aggravated by another day care child falling into Calvin on December 13, resulting in Calvin's death. Beard testified at trial, denying that she had shaken Calvin.

On December 13, 1995, at about 10 a.m., Beard called 911 to report that Calvin was not breathing. Beard told police and firemen who arrived on the scene that she had been in another room, heard a noise, and returned to the living room to find Calvin screaming and crying. According to her statement to the police, Calvin was sitting in an infant seat on the floor, where Beard had left him during his feeding to answer a phone call and then to reheat his food.

Beard told a social worker at Minneapolis Children's Hospital, to which Calvin was rushed by ambulance, that she returned to the living room and saw her son Randy on top of Calvin, trying to get up while Calvin was beneath him screaming.

When Calvin was brought to Children's Hospital, he was unconscious and unresponsive to any stimuli. A CAT scan of his brain showed acute bleeding and diffuse axonal injury. The injury appeared to be inconsistent with Beard's story that Calvin had been struck in the abdomen by another child. The consulting pediatric neurologist testified that the CAT scan showed not only fresh hemorrhages, subdural and subarachnoid, but also a subdural hemorrhage that was some weeks old.

The state presented a number of expert witnesses to testify about Shaken Baby Syndrome, including the physicians who were involved in treating Calvin and the medical examiner who conducted the autopsy. These experts all agreed that Calvin's injuries were caused by shaking and were not consistent with Beard's claim that a child had fallen or somersaulted into Calvin. The medical examiner testified that the fresh subdural hemorrhage, which was on the top of Calvin's brain, was from the shearing force applied to the brain as a result of shaking. He testified that shaking a baby causes rotational forces in the brain that tear the veins and disrupt the nerve processes within the brain. Calvin also had retinal hemorrhages in both eyes. The state's witnesses testified that these hemorrhages strongly indicated that Calvin had been shaken. The prosecutor elicited from nearly all the state's expert witnesses that it was not even a "close call" to diagnose Calvin's death as being caused by Shaken Baby Syndrome.

The defense presented the expert testimony of Dr. Jan Leestma, a neuropathologist, and Dr. Plunkett, the coroner in Dakota and Scott Counties. These experts presented the alternative theory that Calvin could have suffered a subdural hematoma in his fall from the swing and that this old hematoma could have been aggravated and resumed bleeding when another child fell on Calvin on December 13, as Beard had described.

The defense sought to present evidence of the 1993 death of a three-month-old baby girl in Nebraska after the child's swing collapsed, an incident that the Nebraska coroner ruled accidental. The state moved to preclude the defense from presenting this evidence, arguing that the Nebraska case was too dissimilar and the findings in that case were incomplete. At pretrial, the trial court excluded the Nebraska evidence because there was insufficient evidence about the circumstances of the child's accident. The court reaffirmed this ruling at trial, noting the different circumstances of the Nebraska case and the danger of confusing the jury.

The state also filed a pretrial motion to allow it to present *Spreigl* evidence in the form of six incidents of suspicious injury to other children in Beard's day care. The state argued that this evidence was relevant to show intent and absence of accident and was more probative than prejudicial. The trial court deferred ruling on the motion until mid-trial, after the defense had presented its expert testimony. At that time, the trial court ruled that the state could present evidence of three injuries to Justin Thompson, but not three other *Spreigl* incidents involving other children. The trial court also ruled that the state could impeach Beard with her two 1988 convictions for felony credit card fraud.

Beard testified in her own defense, denying that she had shaken Calvin. She testified that she could not hurt Calvin "or any other child." The prosecutor cross-examined Beard on the *Spreigl* incidents of injury to Justin Thompson, after the trial court gave a *Spreigl* cautionary instruction. In rebuttal, the state presented *Spreigl* testimony from Justin Thompson's mother.

The trial court denied Beard's request for a jury instruction on circumstantial evidence, namely, that circumstantial evidence, to support a conviction, must exclude any rational hypothesis of innocence. The jury found Beard guilty of second-degree felony murder as charged. The trial court sentenced her to 360 months, a greater-than-double departure from the presumptive sentence of 165 months, citing the child's particular vulnera-

bility and the violation of the trust placed in her by the child's parents.

## ISSUES

1. Did the trial court abuse its discretion in excluding defense evidence?

2. Did the trial court abuse its discretion in allowing *Spreigl* evidence?

3. Did the court abuse its discretion in declining to give the jury the proposed defense instruction on circumstantial evidence?

4. Did the court abuse its discretion in sentencing?

## ANALYSIS

### 1. Exclusion of Defense Evidence

 Beard argues that the trial court denied her due process right to present a defense by ruling that she could not present evidence of a Nebraska child fatality found to have been caused by a fall or collapse of an infant swing. It is well settled, however, that a defendant has no constitutional right to present evidence that is properly excluded under applicable rules of evidence. *See e.g. State v. Svoboda*, 331 N.W.2d 772, 775 (Minn. 1983) (defendant has to comply with basic rules of foundation to establish relevance of proffered evidence); *State v. Medibus–Helpmobile, Inc.*, 481 N.W.2d 86, 91 (Minn.App. 1992) (criminal defendant's constitutional right to present a defense is limited by the rules of evidence), *review denied* (Minn. Mar. 19, 1992). The trial court has broad discretion to rule on the admission of evidence, and its ruling will not be reversed absent an abuse of discretion. *E.g. State v. Kelly*, 435 N.W.2d 807, 813 (Minn.1989).

In the Nebraska case, the coroner had ruled that the death appeared to be accidental. The coroner noted cerebral edema and acute subdural and subarachnoid hemorrhage. Based apparently on the police investigation and the story given by the child's father that the baby had been in an infant swing three days earlier when the swing collapsed, the coroner opined that "[t]he manner of death appears to be accidental." As the state pointed out in seeking exclusion of this evidence, no examination of the

child's eyes, which might have displayed retinal hemorrhages indicative of shaking, was conducted or reported in the autopsy. Moreover, the defense proposed to present evidence of the case through Dr. Plunkett, who had no first-hand familiarity with it and could have offered no evidence on why the Nebraska infant's eyes were not examined, or why the coroner reached the conclusion that he did.

To have been relevant and admissible, the Nebraska case would have to have had sufficient similarities to be helpful to the jury in assessing Calvin Loftus' injuries. *See generally* Minn. R. Evid. 401 (relevant evidence is evidence having any tendency to make any fact of consequence more or less probable than it otherwise would be); 403 (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of confusing issues or misleading jury). The facts of the Nebraska case, however, differ significantly from the facts of this case, even apart from the failure of Nebraska authorities to investigate the child's death with a thoroughness approaching that of the state's investigation here. Beard now claims that the Nebraska evidence should have been admitted to impeach the testimony of the state's experts that there were no cases of infant deaths from falls from infant swings. But she failed at trial to ask the trial court to reconsider its ruling and allow the Nebraska case as impeachment or rebuttal evidence after the state's experts offered that testimony.

The trial court did not abuse its discretion in excluding the Nebraska evidence. Moreover, the ruling did not prevent Beard from presenting her alternative theory that Calvin died from activation of an old, and accidentally-caused, subdural hematoma. As to the specific issue of whether there were infant deaths from short falls or falls from infant swings, Beard presented her experts' testimony that there were such cases.

### 2. Spreigl Evidence

■ Beard argues that the trial court abused its discretion in admitting *Spreigl* evidence of injuries, allegedly inflicted rather than accidental, suffered by Justin Thompson while in Beard's day care center. The trial court's admission of *Spreigl* evidence will not be reversed absent a clear abuse of discretion. *See e.g. State v. Orfi,* 511 N.W.2d 464, 471 (Minn.App.1994), *review denied* (Minn. Mar. 15, 1994).

■ Before admitting *Spreigl* evidence, the trial court must find that the evidence is clear and convincing that defendant participated in the *Spreigl* offense, that the evidence is relevant and material to the state's case, and that the probative value of the evidence is not outweighed by its potential for unfair prejudice. *State v. DeWald,* 464 N.W.2d 500, 503 (Minn.1991). Absolute similarity between the *Spreigl* offense and the charged offense is not required. *Id.*

This court has affirmed the admission of *Spreigl* evidence of prior child abuse when the defendant was charged with injuring or murdering a child. In *State v. Orfi,* the defendant was convicted of second-degree murder in the death of a 23–month–old child who the state's experts testified was a battered child who had been violently shaken. 511 N.W.2d at 468. There the trial court had allowed the defendant's ex-wife to testify that the defendant "demanded polite behavior from and strictly controlled the feeding of their son." *Id.* at 471. We affirmed the admission of that evidence, holding that a defendant's "past abusive conduct with other children [is admissible to show] a 'callous attitude toward children.'" *Id.* at 471 (quoting *State v. Ostlund,* 416 N.W.2d 755, 762 (Minn.App.1987), *review denied* (Minn. Feb. 24, 1988)).

In *Ostlund,* the defendant was charged with second-degree murder in the death of her infant daughter, allegedly by shaking. 416 N.W.2d at 757. The trial court allowed the state to present evidence of defendant's mistreatment of other children she tended in her day care. *Id.* at 762–63. This included testimony that defendant would drop children eight inches into their cribs, that she would leave the room when a child cried, that she never was seen to feed the younger children, and that she sometimes grabbed children and picked them up by one arm. *Id.* at 762.

Beard argues that the state did not prove by clear and convincing evidence that Justin Thompson's injuries were inflicted rather than accidental. We have held, however, that the *Spreigl* offense of prior abuse of a child was adequately shown by evidence that "[b]y process of elimination" linked the defendant to the child's injury. *State v. Olson,* 459 N.W.2d 711, 715 (Minn.App.1990), *review denied* (Minn. Oct. 25, 1990). The state presented expert testimony that Justin's injuries were all indicative of an abused child. Justin's mother, who had experience as a day care teacher, testified that Beard's explanations for her son's injuries were suspicious or inadequate.

■ The trial court did not clearly abuse its discretion in admitting the *Spreigl* evidence. Moreover, Beard's testimony that she could never hurt any child put in issue her character for the handling of children and virtually waived the *Spreigl* issue, although it was given after the *Spreigl* ruling itself. *See Fader,* 358 N.W.2d at 46 (if defendant had testified that he had never touched any other children, *Spreigl* evidence of other abuse could have been admitted to impeach or contradict that testimony).

### 3. Jury Instruction on Circumstantial Evidence

■ Beard argues that the trial court abused its discretion in denying her request to instruct the jury that, to convict Beard based solely on circumstantial evidence, the "circumstantial evidence must be such as to exclude every reasonable hypothesis except guilt." The trial court's refusal to give a proposed jury instruction will not be reversed absent an abuse of discretion. *State v. Daniels,* 361 N.W.2d 819, 831 (Minn.1985).

■ Detailed instructions on circumstantial evidence, such as the "rational hypothesis other than guilt" language, although applied to appellate review of the sufficiency of the evidence, need not be given as part of the jury instructions. *State v. Turnipseed,* 297 N.W.2d 308, 312 (Minn.1980). The giving of such a detailed instruction on the weighing of circumstantial evidence risks jury confusion. *See Holland v. United States,* 348 U.S. 121, 139–40, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). The supreme court has disagreed with a decision of this court holding that the "rational hypothesis of innocence" instruction should have been given. *State v. Jones,* 498 N.W.2d 44 (Minn.App.1993), *aff'd on other grounds* 516 N.W.2d 545, 546 (Minn.1994) (evidence insufficient to support conviction). The supreme court reaffirmed the *Turnipseed* holding that the instruction is not mandatory. *Jones,* 516 N.W.2d at 548, n. 4. Therefore, we cannot conclude that the trial court abused its discretion in declining to give the "rational hypothesis of innocence" instruction.

### 4. Sentencing Departure

■ Beard argues that the trial court abused its discretion in departing upward from the presumptive sentence of 165 months to 360 months, a greater-than-double departure. *See generally State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981) (the trial court's decision to depart will not be reversed absent an abuse of discretion).

■ Beard's offense was aggravated by the absolute vulnerability of Calvin Loftus and by Beard's violation of the position of trust conferred on her by Calvin's parents. *See State v. Olson,* 459 N.W.2d 711, 716 (Minn.App.1990), (vulnerability of defenseless six-week-old baby and cruelty of offense counterbalanced mitigating factors) *review denied* (Minn. Oct. 25, 1990); *State v. Morrison,* 437 N.W.2d 422, 429 (Minn.App.1989) (vulnerability of three-year-old along with defendant's violation of position of trust, and other aggravating factors, supported double departure), *review denied* (Minn. Apr. 26, 1989); *State v. Olson,* 436 N.W.2d 817, 821 (Minn.App.1989) (vulnerability of three-year-old child, violation of position of authority and trust, particular cruelty, and other factors supported quadruple departure), *review denied* (Minn. Apr. 26, 1989). We reject Beard's argument that the departure should be reversed because there are cases of physical abuse of children in which no departure was imposed or at least not challenged on appeal. *See State v. Bellaphant,* 535 N.W.2d 667 (Minn.App.1995) (no discussion of departure), *review denied* (Minn. Sept. 28, 1995);

*State v. Ostlund,* 416 N.W.2d at 757 (no discussion of departure). A trial court's failure to depart in other cases, precluding extensive appellate review of the severity of the offense, is not precedential authority against a sentencing departure.

 The trial court imposed a greater-than-double departure. Such a departure requires unusually compelling circumstances. *State v. Evans,* 311 N.W.2d 481, 483 (Minn. 1981). Only in a "rare" case are aggravating circumstances so severe as to warrant a greater-than-double departure. *State v. Weaver,* 474 N.W.2d 341, 343 (Minn.1991). We conclude that this is not the "rare" case in which a greater-than-double departure is permitted. The prosecutor requested a double departure, which implied a judgment that enhanced aggravating circumstances were not present in this case. Absent are the multiple injuries and psychological trauma inflicted on another child witnessing the abuse, factors that helped support a quadruple departure in *Olson,* 436 N.W.2d at 821. Accordingly, we modify the 360–month sentence imposed to 330 months, a double departure.

### 5. Pro Se Brief

 Beard has submitted a pro se supplemental brief raising a number of issues. Several of these concern the credibility of the state's witnesses and the weight to be given their testimony, which are matters for the jury to determine. *State v. Lodermeier,* 539 N.W.2d 396, 397 (Minn.1995). We cannot address Beard's claims of juror bias or witness coaching because the record does not include a transcript of voir dire, or a motion for a new trial, or other record of the alleged coaching incident. The record does show that defense counsel was allowed extensive cross-examination of Richard Loftus, Calvin's father, concerning his first marriage and children born of that marriage. The trial court's exclusion of testimony from Richard Loftus' first wife, who was not timely disclosed as a potential witness, was not an abuse of discretion. Finally, neither that ruling nor the trial court's other rulings, not all of which were adverse to the defense, show bias on the part of the trial judge. *See*

*generally State v. Kramer,* 441 N.W.2d 502, 505 (Minn.App.1989) (prior advance ruling not sufficient to show prejudice), *review denied* (Minn. Aug. 9, 1989).

### DECISION

The trial court did not abuse its discretion in excluding defense evidence, in allowing *Spreigl* evidence, or in instructing the jury. The court properly departed upward in sentencing, but a greater-than-double departure is not warranted.

**Affirmed as modified.**